257 P.3d 1 (2011)
161 Wash.App. 135
STATE of Washington, Respondent,
v.
Kevin Michael ABUAN, Appellant.
No. 38325-0-II.
Court of Appeals of Washington, Division 2.
April 12, 2011.
*3 Valerie Marushige, Attorney at Law, Kent, WA, for Appellant.
Stephen D. Trinen, Pierce County Prosecutors Office, Tacoma, WA, for Respondent.
VAN DEREN, J.
¶1 Kevin Abuan appeals his convictions for drive by shooting and two counts of second degree assault with firearm enhancements.[1] Abuan argues that (1) the pat down search of his person and the subsequent search of the vehicle in which he was a passenger incident to arrest of the driver violated article I, section 7 of the Washington State Constitution and (2) the evidence was insufficient to support his conviction on the second degree assault charge, count VI, wherein Fomai Leoso was the alleged victim.[2]
¶2 We reverse all of Abuan's convictions because the officer's pat down of Abuan, a vehicle passenger, without reasonable, articulable, and individualized suspicion that he was armed and dangerous or independently connected to illegal activity and the subsequent search of the vehicle violated article I, section 7 of the Washington constitution. We also hold that the evidence was insufficient to support Abuan's conviction on count VI, the second degree assault conviction involving Fomai Leoso. We remand to the trial court to vacate the convictions and to dismiss the second degree assault conviction on count VI with prejudice.

*4 FACTS
¶3 The Outlaw Crip Killers (OLCK) is a street gang that is an offshoot of the larger Bloods gang.[3] Fomai Leoso and his brother, Francis Leoso,[4] were both members of the OLCK street gang. During the time relevant to this case, the OLCKs came into a territorial conflict with a Crips-affiliated gang, the Native Gangster Crips (NGC).
¶4 Around midnight on August 15, 2007, Francis, his younger brother, and Francis's uncle were in the Leoso garage. The garage door was fully open. Francis heard a car driving by. Suddenly, someone shouted, "N-G-C, cuz" and gunfire erupted. 8 Report of Proceedings (RP) at 1016. Francis grabbed a gun, ran into the street, and returned fire at the car. Later a crime scene technician recovered nine, 9 millimeter shell casings in front of the Leoso residence. Forensics experts later matched all nine shell casings recovered from the scene to Francis's gun. And the technician detected bullet damage to only the residence's garage frame and door.
¶5 Before the shooting began on August 15, Fomai was inside the house on the telephone and he was unable to see who was shooting or what was happening in front of the garage. After the shooting, he ran outside where he found Francis. After Francis fired nine shots at the fleeing car, he and Fomai "jumped in[to a] car" and drove around looking for the car with the shooters, but they were unable to find it. 10 RP at 1288. Eventually, police officers pulled them over. During the stop, the officers found Francis's gun in the vehicle. The officers arrested Francis and released Fomai.
¶6 On August 17, Tacoma Police Officers Randall Frisbee and Henry Betts initiated a traffic stop of a red Chevrolet Corsica with expired registration tabs. Neither Frisbee nor Betts noted or recalled any furtive movements by the vehicle's occupants as they pulled it over. According to Frisbee, the vehicle's occupants were "cooperative [and] cordial" and there was "[n]o indication of drugs or alcohol or anything." 5 RP at 368. The Corsica's driver identified himself as Raymond Howell. After Howell stated that he did not have a driver's license or other form of identification, Frisbee removed him from the vehicle and placed him in the back of the patrol car. After running a records check on Howell's name, Betts discovered that Howell had a suspended driver's license and informed Howell that he was under arrest for driving with a suspended license.
¶7 While Frisbee was contacting and removing Howell from the vehicle, Betts contacted Abuan, the passenger. Betts did not testify to any furtive movements by Abuan before or while the officers pulled the vehicle over, nor at any point after the vehicle was pulled over, did Betts lose sight of Abuan or observe him make any furtive movements. After Frisbee removed Howell from the vehicle, Betts asked Abuan to step out of the vehicle so that the officers could search it incident to Howell's arrest. When Abuan exited the vehicle, Betts told him that he was not under arrest but that Betts wanted to search Abuan for weapons. As Betts began to search Abuan, Abuan stated, "I ain't going to lie to you. I have a little bit of weed," and began reaching for his "[r]ight pants or shorts pocket." 5 RP at 481-82. Betts prevented Abuan from reaching into his pocket, handcuffed him, removed the suspected marijuana from Abuan's pocket, and placed him beside Howell in the back of the patrol car. Frisbee informed Abuan of his Miranda[5] rights.
¶8 Betts conducted a search of the vehicle incident to Howell's arrest. Betts discovered *5 a 9 millimeter handgun under the driver's seat. Neither Frisbee nor Betts could see the gun from outside the vehicle. Because they had read the police report on the August 15 shooting and knew that law enforcement had recovered 9 millimeter shell casings from the scene, Frisbee and Betts began to inspect the vehicle more closely. They discovered that something had recently broken out the vehicle's rear passenger side brake light and had caused a small indentation in the light's inner, metal casing. According to Betts, the damage was consistent with a gunshot.
¶9 Abuan noticed the officers examining the vehicle and explained that he had been riding in it with a female cousin on another occasion when someone had fired two shots at them. Abuan also admitted to membership in the Native Gangster Bloods (NGB), a Bloods-affiliated gang and showed the officers his tattoos and his red belt and shoes, all of which indicated membership in the Bloods gang. Abuan stated that Howell was a "wannabe"[6] of the "Morton Blocc Crips." 5 RP at 408. Law enforcement impounded the vehicle for evidence processing.
¶10 Later that day, Tacoma Police Detective John Bair visited Abuan in custody and again advised him of his Miranda rights. According to Bair, Abuan's demeanor was "cooperative," "awake," "responsive," and did not indicate "anything out of the ordinary." 6 RP at 645. Bair checked to ensure Abuan understood his rights, and Abuan indicated he voluntarily wanted to answer questions. Bair questioned him about the August 15 shooting. Abuan stated that he had driven the vehicle involved in the August 15 shooting, that Howell was the front seat passenger, and that "Marquez" and "Little Bear" were in the back seat. 6 RP at 646-47. Abuan stated that he thought the group was driving by the Leoso residence only to flash gang signs, but that something different happened once they got there. Following his interview with Abuan, Bair identified and located Marquez, determined he had a "very solid" alibi regarding the August 15 shooting, and excluded him as a suspect. 6 RP at 652.
¶11 On August 20, Bair interviewed Abuan a second time while he remained in custody. After advising Abuan of his Miranda rights and obtaining a waiver, Bair immediately told Abuan that he had lied about Marquez's presence in the vehicle, to which Abuan agreed. Abuan stated that he had spoken with Howell about the August 15 shooting. He further stated that he had been high on narcotics when Bair first interviewed him, that he had not been in the vehicle involved in the August 15 shooting, and that a "Jeremy [James]" had fired the shots on that day. 6 RP at 655. When Bair confronted Abuan with the claim that he had coordinated his story with Howell, Abuan said he "didn't want to talk about it anymore." 6 RP at 660.
¶12 The State's second amended information charged Abuan with one count of drive by shooting with a gang aggravator in connection with the August 15 shooting (count III), one count of second degree unlawful possession of a firearm in connection with the August 17, 2007, traffic stop (count IV), and two counts of second degree assault in connection with the August 15 shooting, one involving Francis (count V) and one involving Fomai (count VI). Both assault counts included firearm enhancements and gang aggravators. The State did not charge Abuan with assault of the other two individuals who were actually in the garage with Francis at the time of the shooting.
¶13 At the conclusion of the State's case, the trial court granted Abuan's motion to dismiss count IV. The trial court's jury instructions stated that "[a] person commits the crime of assault in the second degree when he or she assaults another with a deadly weapon." Clerk's Papers (CP) at 239. The trial court instructed the jury that to convict Abuan of second degree assault it had to find that Abuan had "assaulted Fomai Leoso with a deadly weapon" and that a firearm was a "deadly weapon." CP at 242, 246. The jury convicted Abuan of drive by shooting, second degree assault of Francis, and second degree assault of Fomai, with firearm enhancements on the assault convictions. The jury found that the State had not *6 proven the gang aggravator on any of the charges.
¶14 The trial court sentenced Abuan to standard range sentences of 36 months on the drive by shooting (count III) and 20 months each on the second degree assault convictions (counts V and VI), plus additional firearm enhancements of 36 months to be served consecutively on each second degree assault conviction, for a total sentence of 108 months.
¶15 Abuan appeals.

ANALYSIS
¶16 Abuan first argues that Betts's pat down search violated article I, section 7 of the Washington State Constitution. The State did not respond to this argument in its briefing.

I. Warrantless Pat Down Search
¶17 Abuan challenges the pat down search for the first time on appeal. RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal. But RAP 2.5(a)(3) allows appellants to raise claims for the first time on appeal if such claims constitute manifest constitutional error. In order to establish manifest constitutional error allowing appellate review, appellants must demonstrate actual prejudice resulting from the error. State v. Kirkman, 159 Wash.2d 918, 935, 155 P.3d 125 (2007). "`Essential to this determination is a plausible showing . . . that the asserted error had practical and identifiable consequences in the trial.'" Kirkman, 159 Wash.2d at 935, 155 P.3d 125 (internal quotation marks omitted) (quoting State v. WWJ Corp., 138 Wash.2d 595, 603, 980 P.2d 1257 (1999)). An appellant demonstrates actual prejudice when he establishes from an adequate record that the trial court likely would have granted a suppression motion. State v. Contreras, 92 Wash.App. 307, 312, 966 P.2d 915 (1998).
¶18 Both the Fourth Amendment to the federal constitution and article I, section 7 of our state constitution prohibit warrantless searches unless one of the narrow exceptions to the warrant requirement applies. State v. Buelna Valdez, 167 Wash.2d 761, 768, 771-72, 224 P.3d 751 (2009). Article I, section 7 provides more extensive privacy protections than the Fourth Amendment and creates "`an almost absolute bar to warrantless arrests, searches, and seizures.'" Valdez, 167 Wash.2d at 772, 224 P.3d 751 (internal quotation marks omitted) (quoting State v. Ringer, 100 Wash.2d 686, 690, 674 P.2d 1240 (1983)). In the traffic stop context, the arrest of one or more vehicle occupants does not, without more, justify a warrantless search of other, nonarrested passengers. State v. Grande, 164 Wash.2d 135, 143, 187 P.3d 248 (2008). Absent a reasonable, articulable, and individualized suspicion that a passenger "is armed and dangerous or independently connected to illegal activity, the search of a passenger incident to the arrest of the driver is invalid under article I, section 7." State v. Jones, 146 Wash.2d 328, 336, 45 P.3d 1062 (2002); see also State v. Broadnax, 98 Wash.2d 289, 296, 654 P.2d 96 (1982), abrogated in part on other grounds by Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The level of articulable suspicion required to justify the search or seizure based on suspicion of criminal activity is "`a substantial possibility that criminal conduct has occurred or is about to occur.'" State v. Mendez, 137 Wash.2d 208, 223, 970 P.2d 722 (1999) (quoting State v. Kennedy, 107 Wash.2d 1, 6, 726 P.2d 445 (1986)), abrogated in part on other grounds by Brendlin v. California, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). The conduct the officer observes must be "`more consistent with criminal than innocent conduct.'" State v. Pressley, 64 Wash. App. 591, 596, 825 P.2d 749 (1992) (quoting State v. Mercer, 45 Wash.App. 769, 774, 727 P.2d 676 (1986)). The remedy for a violation of article I, section 7 is suppression of the evidence obtained either during or as a direct result of an unconstitutional search or seizure. Valdez, 167 Wash.2d at 778, 224 P.3d 751.
¶19 Here, the officers arrested the driver, Howell, for driving with a suspended license. Neither officer testified that they suspected Abuan was armed or engaged in criminal activity before beginning to search him. To *7 the contrary, Frisbee testified that Abuan was "cooperative [and] cordial" and that there was "[n]o indication of drugs, alcohol or anything." 5 RP at 368. Betts testified that he could not recall any furtive movements by Abuan before pulling the car over and that he did not lose sight of Abuan or observe any furtive moments by him after pulling the car over.
¶20 The officers' testimony affirmatively establishes the lack of any reasonable and articulable justification for searching Abuan. Thus, the trial court likely would have granted a motion to suppress Abuan's statement that he had marijuana on his person, the marijuana itself, and all evidence obtained as a direct result of the unlawful search of his person and his resulting arrest, including his subsequent statements to law enforcement officers. Under manifest error review, however, we further determine whether the record establishes the absence of other bases justifying the warrantless search of the vehicle and the resulting discovery of the firearm leading to Abuan's convictions.

II. Warrantless Vehicle Search
¶21 Abuan contends that the warrantless search of the vehicle also violated article I, section 7 of the Washington constitution. The State counters that Abuan waived his right to challenge the warrantless search of the vehicle by failing to raise the issue at trial.

A. Waiver
¶22 Abuan did not challenge the warrantless search of the vehicle at trial because State v. Patton, 167 Wash.2d 379, 219 P.3d 651 (2009) and Valdez were decided after his trial and convictions.[7] Several panels of this court have held that, under principles of retroactivity, application of new constitutional rules of criminal procedure allows a defendant to raise a challenge to a vehicle search incident to arrest for the first time on appeal. See, e.g., State v. Harris, 154 Wash. App. 87, 98-99, 224 P.3d 830 (2010); State v. McCormick, 152 Wash.App. 536, 540, 216 P.3d 475 (2009), petition for review filed, No. 83796-1 (Wash. Oct. 27, 2009). Furthermore, in the context of manifest error review, we have previously rejected an absolute bar to raising suppression issues for the first time on appeal. In Contreras, we stated:
Here, the State . . . argu[es] that, where there has been no trial court ruling, an appellate court cannot know what the trial court would have done and, therefore, cannot review the alleged error. But such a narrow reading of [State v.] McFarland, [127 Wash.2d 322, 334, 899 P.2d 1251 (1995)] would essentially preclude any review of any alleged error resulting from failure to make any motion or any objection at trial; we could no longer review such errors for the first time on appeal because there would be no record of how the trial court would have ruled. Adopting the State's position would preclude review on a record devoid of a trial court's ruling where no motion or objection was made; such an outcome would directly contravene RAP 2.5 and render the rule essentially meaningless. We therefore decline to adopt such a narrow reading of McFarland.

92 Wash.App. at 312-13, 966 P.2d 915.
¶23 Additionally, our Supreme Court's recent opinion in State v. Afana, 169 Wash.2d 169, 233 P.3d 879 (2010), supports considering Abuan's argument for the first time on appeal even though the record regarding his arrest and the search incident to arrest is not as developed as it would have been had he moved to suppress the evidence below. The Afana court applied Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), Patton, and Valdez without discussing waiver or retroactivity and held that a vehicle search violated article I, section 7 of our state constitution, even though the record regarding the arrest and search incident to arrest was not developed through a challenge at trial:
The suppression hearing . . . addressed the legality of the deputy's request for [defendant]'s identification, not the arrest *8 and search incident to arrest. Thus, the trial court did not make specific findings of fact regarding [defendant]'s arrest, finding only that the deputy "arrested the passenger on the warrant."
Afana, 169 Wash.2d at 174 n. 1, 233 P.3d 879 (citation omitted), 176-79. The Afana court reasoned that "it is the State's burden to show that the automobile search incident to arrest exception applies" and "[n]othing in the record justifies the search that took place here as incident to arrest." 169 Wash.2d at 178 and n. 4, 233 P.3d 879. Thus, Abuan's failure to raise this issue at trial is not necessarily fatal to his raising it on appeal.

B. Good Faith or Inevitable Discovery Exceptions
¶24 The State contends that both the good faith and inevitable discovery exceptions to the exclusionary rule justified the vehicle search. But our Supreme Court has rejected both the good faith and inevitable discovery exceptions as incompatible with the article I, section 7 exclusionary rule. Afana, 169 Wash.2d at 184, 233 P.3d 879; State v. Winterstein, 167 Wash.2d 620, 636, 220 P.3d 1226 (2009). Furthermore, no open view or plain view exceptions to the warrant requirement apply, as both officers testified that they could not see the gun from outside the vehicle.

C. Vehicle Search Incident to Arrest
¶25 Without the illegal pat down search of Abuan and the evidence resulting from it, the officers could not rely on his subsequent arrest for marijuana possession as a basis for a warrantless search of the vehicle. Afana, 169 Wash.2d at 178-79, 233 P.3d 879 (an individual, not under arrest, is not an "arrestee" contributing to circumstances that justify a warrantless search of a vehicle incident to arrest). Similarly, the State cannot rely on Howell's arrest for driving with a suspended license to justify the warrantless vehicle search.
¶26 In Gant, the United States Supreme Court held that a search incident to arrest under the Fourth Amendment may be justified on three separate basesofficer safety, preserving evidence, or searching for evidence of the crime of arrest. 129 S.Ct. at 1716, 1719. The Court expressly stated that driving with a suspended license is an offense for which police could not reasonably expect to find evidence in a vehicle. Gant, 129 S.Ct. at 1719.
¶27 Likewise, as the Washington Supreme Court has recognized, article I, section 7 of our state constitution requires "no less" than the Fourth Amendment protections. Patton, 167 Wash.2d at 394, 219 P.3d 651. Thus,
the search of a vehicle incident to the arrest of a recent occupant is unlawful absent a reasonable basis to believe that the arrestee poses a safety risk or that the vehicle contains evidence of the crime of arrest that could be concealed or destroyed, and that these concerns exist at the time of the search.
Patton, 167 Wash.2d at 394-95, 219 P.3d 651. Our Supreme Court held that "an automobile search incident to arrest is not justified unless the arrestee is within reaching distance of the passenger compartment at the time of the search, and the search is necessary for officer safety or to secure evidence of the crime of arrest that could be concealed or destroyed." Patton, 167 Wash.2d at 384, 219 P.3d 651. Our Supreme Court subsequently elaborated on this holding in Valdez:
[W]hen an arrest is made, the normal course of securing a warrant to conduct a search is not possible if that search must be immediately conducted for the safety of the officer or to prevent concealment or destruction of evidence of the crime of arrest. However, when a search can be delayed to obtain a warrant without running afoul of those concerns (and does not fall under another applicable exception), the warrant must be obtained. A warrantless search of an automobile is permissible under the search incident to arrest exception when that search is necessary to preserve officer safety or prevent destruction or concealment of evidence of the crime of arrest.
167 Wash.2d at 777, 224 P.3d 751 (emphasis added).
¶28 Significantly, the Valdez court recognized that Gant allows officers to search for *9 evidence of the crime of arrest independent of officer safety or destruction of evidence concerns when conducting a search incident to arrest under the Fourth Amendment. See 167 Wash.2d at 770-71, 224 P.3d 751 (citing Gant, 129 S.Ct. at 1719). But the Valdez court chose not to include that justification in its own holding, limiting the bases of a search incident to arrest under article I, section 7. 167 Wash.2d at 777, 224 P.3d 751 ("[A]fter an arrestee is secured and removed from the automobile, he or she poses no risk of obtaining a weapon or concealing or destroying evidence of the crime of arrest located in the automobile, and thus the arrestee's presence does not justify a warrantless search under the search incident to arrest exception.").
¶29 Thus, as we recently observed, "[A]rticle I, section 7 limits a search incident to arrest to situations where threats to officer safety or the preservation of evidence prevent the arresting officer from delaying the search to obtain a warrant." State v. Swetz, 160 Wash.App. 122, 132, 247 P.3d 802 (2011) (citing Valdez, 167 Wash.2d at 777, 224 P.3d 751; Patton, 167 Wash.2d at 394-95, 219 P.3d 651), petition for review filed, (Mar. 11, 2011). In Swetz, we held that a police officer's search of a vehicle after arresting its only occupant and securing him in handcuffs in the back of his patrol car violated article I, section 7. 160 Wash.App. at 132, 137, 247 P.3d 802.
¶30 Here, before the officers searched the vehicle, they had secured both Howell, the pertinent arrestee, and Abuan in the back of a patrol car. Thus, neither Howell nor Abuan posed a threat to officer safety or to concealment or destruction of the evidence. Furthermore, even assuming contrary to our reading of Patton and Valdez that a reasonable belief that evidence of the crime of arrest provided a lawful basis for the vehicle search under article I, section 7, Howell's arrest for driving with license suspended could not give rise to such a belief. The warrantless vehicle search incident to Howell's arrest violates article I, section 7 of our state constitution.

D. Inventory and Impoundment Vehicle Search
¶31 Finally, the dissent "would adopt Division One's recent approach to a vehicle inventory search incident to arrest and impoundment of a vehicle in State v. Roberts, 158 Wash.App. 174, 240 P.3d 1198 (2010), petition for review filed, No. 85565-0 (Wash. Jan. 25, 2011)." Dissent at 14. It would hold that, under Roberts, Abuan fails to demonstrate "manifest" constitutional error. Dissent at 14. But this analysis conflates searches incident to arrest and inventory searches, separate and distinct exceptions to the warrant requirement, and it subsequently misapprehends the Roberts court's reasoning. See State v. Duncan, 146 Wash.2d 166, 171-72, 43 P.3d 513 (2002) (stating that searches incident to arrest and inventory searches are separate warrant requirement exceptions).
¶32 In Roberts, the defendant "concede[d] there were two plausible grounds for the police to search his vehicle, a search incident to arrest and an inventory search, but assert[ed] that the record show[ed] the primary purpose of the search was to find contraband," thus, rendering the search unlawful. 158 Wash.App. at 177, 240 P.3d 1198. The deputies' testimony established that an inventory search was one basis for searching the vehicle. Roberts, 158 Wash.App. at 177-78, 240 P.3d 1198. The court, observing that the evidence "show[ed] that the deputies searched the car as a search incident to arrest and for inventory purposes at the same time," reasoned that "[i]f [the] deputies conducted a valid inventory search, a motion to suppress would have been denied." Roberts, 158 Wash.App. at 182-83, 240 P.3d 1198. The court further reasoned:
Because the defense did not file a CrR 3.6 motion to suppress the cocaine seized from the car, the record is not sufficient to determine the merits of Roberts' claim that the primary purpose of the search was to find contraband, not to conduct an inventory search. The record is also not adequate to determine whether the inventory search was reasonable or there were reasonable alternatives to impoundment. Accordingly, we conclude the record is insufficient to address the merits of whether *10 the inventory search was a valid basis for the search.
Roberts, 158 Wash.App. at 184, 240 P.3d 1198. Thus, the court concluded that, because Roberts did not raise the issue at the trial court and the record was not developed, Roberts failed to demonstrate his constitutional claim of error was manifest and subject to appellate review. Roberts, 158 Wash. App. at 184-85, 240 P.3d 1198.
¶33 First, we would assert that Afana dictates a different result in Roberts as it is the State's burden to show that a warrant exception applies and the defendant's failure to raise the issue at trial is not fatal to such an issue on appeal. 169 Wash.2d at 176-79, 233 P.3d 879. But even if we were to agree with Division One's analysis in Roberts, this case is distinguishable. Abuan does not concede and the evidence does not establish any applicable warrant exception. The State relies on the good faith and inevitable discovery exceptions to the exclusionary rule that were clearly rejected by our Supreme Court. Afana, 169 Wash.2d at 184, 233 P.3d 879; Winterstein, 167 Wash.2d at 636, 220 P.3d 1226. It also relies on the search incident to Howell's arrest, which fails because the search was not based on concerns for officer safety, destruction of evidence, or evidence of the crime of arrest. Driving with a suspended license is an offense for which police could not reasonably expect to find evidence in a vehicle. Gant, 129 S.Ct. at 1719.
¶34 Abuan has demonstrated actual prejudice and, thus, manifest error because the trial court likely would have granted a motion to suppress evidence obtained during or as a direct result of the vehicle search based on Howell's arrest, including Abuan's statements to Betts, the handgun found under the driver's seat, and Abuan's statements to Bair. Accordingly, we reverse his convictions.
¶35 We also address the issue of sufficiency of the evidence of second degree assault of Fomai in the event further proceedings arise relating to this shooting incident.

II. Sufficiency of the Evidence of Second Degree Assault of Fomai Leoso
¶36 Abuan also challenges his conviction for second degree assault against Fomai Leoso. He asserts that, because Fomai was inside the house during the August 15 shooting and bullets only hit the garage, Fomai could not have been placed in reasonable apprehension and imminent fear of bodily injury. We agree.
¶37 RCW 9A.36.021(1)(c) provides that "[a] person is guilty of assault in the second degree if he or she . . . [a]ssaults another with a deadly weapon." See also CP at 239 (stating the same). The statute does not define "assault"; thus, the courts must resort to the common law definition. State v. Byrd, 125 Wash.2d 707, 712, 887 P.2d 396 (1995). Washington recognizes three common law definitions of assault: "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." State v. Elmi, 166 Wash.2d 209, 215, 207 P.3d 439 (2009). Furthermore, under the common law "specific intent either to create apprehension of bodily harm or to cause bodily harm is an essential element of assault in the second degree." Byrd, 125 Wash.2d at 713, 887 P.2d 396.
¶38 The trial court instructed the jury that, in order to convict Abuan of second degree assault, it had to find that he had "assaulted Fomai Leoso with a deadly weapon." CP at 246. Under these instructions, in order to find an assault of Fomai, the jury had to find that (1) Abuan performed an act with specific intent to inflict bodily injury on Fomai (attempted battery) or, (2) even though Abuan did not actually intend to inflict bodily injury, Abuan performed an act with specific intent to cause reasonable apprehension of bodily injury and (3) Fomai had a reasonable apprehension and imminent fear of bodily injury (fear in fact). State v. Eastmond, 129 Wash.2d 497, 500, 919 P.2d 577 (1996), overruled on other grounds by State v. Brown, 147 Wash.2d 330, 340, 58 P.3d 889 (2002); Byrd, 125 Wash.2d at 713, 887 P.2d 396.
¶39 Sufficient evidence supports a conviction if, when viewed in the light most *11 favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. State v. Hosier, 157 Wash.2d 1, 8, 133 P.3d 936 (2006). On appeal, we draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. Hosier, 157 Wash.2d at 8, 133 P.3d 936. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. State v. Goodman, 150 Wash.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from conduct that plainly indicates such intent as a matter of logical probability. Goodman, 150 Wash.2d at 781, 83 P.3d 410. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970, abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
¶40 The dissent argues that Abuan's intent to harm those in the garage was transferred to Fomai, an unknown and uninjured person in the house. Dissent at 16-17. In reaching this conclusion, the dissent relies on Elmi's analysis of the first degree assault statute, RCW 9A.36.011(1)(a).
¶41 Elmi fired gunshots into a living room where his estranged wife and three children were. Elmi, 166 Wash.2d at 212, 207 P.3d 439. Elmi did not dispute his intent to assault his estranged wife, but argued that the State had to prove his specific intent to assault the children. Elmi, 166 Wash.2d at 214, 216, 207 P.3d 439. The trial court gave the jury a transferred intent instruction.[8]Elmi, 166 Wash.2d at 213, 207 P.3d 439.
¶42 First, we note that the trial court here did not give a transferred intent jury instruction. The trial court instructed the jury that to convict Abuan of second degree assault of Fomai, the State had to present sufficient evidence showing that Abuan "assaulted Fomai" with specific intent to cause bodily harm to "another" by use of a deadly weapon or with specific intent to create an apprehension of bodily harm in "another" and that Fomai experienced fear in fact. CP at 246, 239; Eastmond, 129 Wash.2d at 500, 919 P.2d 577; Byrd, 125 Wash.2d at 713, 887 P.2d 396. When the jury instruction identifies a victim, i.e., "Fomai," thus specifying "another" as did the jury instruction here, it is the law of the case and there is no room for a transferred intent analysis without a transferred intent jury instruction. State v. Hickman, 135 Wash.2d 97, 102, 954 P.2d 900 (1998) (stating that "jury instructions not objected to become the law of the case").
¶43 Second, in turning to Elmi, our Supreme Court accepted review solely on the issue of transferred intent in first degree assault. 166 Wash.2d at 214, 207 P.3d 439. It considered whether a defendant's specific intent to harm one victim transferred "to meet the intent element" against other, unintended victims. 166 Wash.2d at 216, 207 P.3d 439. The Elmi court concluded that it need not analyze the issue under the common law doctrine of transferred intent because the first degree assault statute itself "encompasses transferred intent."[9] 166 Wash.2d at 218, 207 P.3d 439.
¶44 The court reasoned that the first degree assault statute "provides that once [intent] is established, any unintended victim is assaulted if they fall within the terms and conditions of the statute." Elmi, 166 Wash.2d at 218, 207 P.3d 439 (emphasis added). *12 These "terms and conditions" include not only a mens rea intent element, but also an actus reus element of any of the three common law forms of assault, i.e., "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." Elmi, 166 Wash.2d at 215, 207 P.3d 439.
¶45 Our Supreme Court observed that Elmi assaulted his wife, his intended victim, when he attempted to batter her by firing into the living room (the actus reus) with intent to inflict bodily injury (the mens rea). Elmi, 166 Wash.2d at 218, 207 P.3d 439. Thus, it concluded that sufficient evidence supported Elmi's conviction of first degree assault against the children because (1) his specific intent to harm the intended victim transferred to the unintended victims also in the living room, satisfying the mens rea intent element of the crime and (2) Elmi's actions put the unintended victims in apprehension of bodily harm, satisfying the acteus reus element. Elmi, 166 Wash.2d at 218-19, 207 P.3d 439.
¶46 Here, the dissent concludes that transferred intent is sufficient to support Abuan's conviction for second degree assault and assumes, without evidence in the record, that Fomai was placed in apprehension of bodily harm. Dissent at 16-17, 18-19. But, as the dissent correctly observes, there are differences between first degree assault as charged in Elmi, RCW 9A.36.011(1)(a), and second degree assault as charged in this case, RCW 9A.36.021 (1)(c). Dissent at 16-17. Furthermore, the State did not request and the trial court did not give a transferred intent instruction here.
¶47 The first degree assault statute, RCW 9A.36.011(1)(a), provides in pertinent part, "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . assaults another with a firearm." The Elmi court reasoned that the phrase "intent to inflict great bodily harm" codifies "[s]pecific intent . . . to produce a specific result, as opposed to intent to do the physical act that produces the result." 166 Wash.2d at 214-215, 207 P.3d 439. The Elmi court, also observing the first degree assault statute's use of the word "another," reasoned that the statute encompasses transferred intent because the statute does not match specific intent with a specific victim. RCW 9A.36.011(1)(a); 166 Wash.2d at 215, 217-218, 207 P.3d 439.
¶48 In contrast, second degree assault, as charged in this case and defined in the jury instructions, means that "[a] person is guilty of assault in the second degree if he or she . . . [a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c). It does not expressly codify specific "intent to inflict bodily harm" and, thus, Elmi's analysis of "statutory" transferred intent under the first degree assault statute is not controlling in cases involving only second degree assault under RCW 9A.36.021(1)(c). RCW 9A.36.011(1)(a). We adhere to our Supreme Court's holding in Byrd that "specific intent either to create apprehension of bodily harm or to cause bodily harm is an essential element of assault in the second degree," 125 Wash.2d at 713, 887 P.2d 396, and that its intent element is based on the common law, not on express statutory codification. Here, if we were to use the dissent's transferred intent analysis from Elmi, arguably anyone in the neighborhood who heard the gunshots could be a victim of an assault by Abuan. We are unwilling to extend Elmi this far.
¶49 Viewing the evidence in the light most favorable to the State, no trier of fact could have found that Abuan specifically intended to assault Fomai. There is no evidence that Abuan knew Fomai was at the house or that Abuan intended to fire the gun at Fomai. Francis, his younger brother, and his uncle were in the garage. The attached garage covered most of the front of the house and, when shots were fired, Fomai was in the house on the telephone and could not see the shooting. No shots hit the house, although bullets hit the garage. A crime scene technician detected bullet damage only to the garage frame and door.
¶50 Contrary to the dissent's characterization of the drive by shooters "spraying" the house with bullets, the nine casings found in the street by the crime scene technician all *13 belonged to Francis's gun, which he fired at the fleeing car. Dissent at 17, 17-18. The technician found no other bullets or casings on the Leoso property.
¶51 Further, sufficient evidence does not support a conclusion that Abuan assaulted Fomai by causing fear in fact.[10] The State did not even attempt to prove that Fomai thought shots were fired at him or that he was apprehensive or fearful. The dissent contests this, citing State v. Miller, 71 Wash.2d 143, 426 P.2d 986 (1967). Dissent at 18-19. Miller states, "Apprehension of a person at whom a revolver is pointed may be inferred, unless he knows it to be unloaded." 71 Wash.2d at 146, 426 P.2d 986. But Miller is distinguishable where, as here, Abuan did not point a gun at Fomai, Fomai did not see the shooter or the gun, and Fomai was in the house where he could not see any shooting.[11]
¶52 In the absence of shots being fired into the house where Fomai was on the telephone and in the absence of any injury or apprehension and imminent fear of bodily injury, no trier of fact could have found all the elements of the crime beyond a reasonable doubt.[12] Thus, even without suppression of the evidence seized in the vehicle on August 17, leading to Abuan's arrest, statements, and conviction, Abuan's conviction for second degree assault against Fomai was not supported by sufficient evidence and it must be vacated and dismissed with prejudice. Hickman, 135 Wash.2d 97 at 103, 954 P.2d 900.
¶53 We reverse all of Abuan's convictions because the officers' pat down of Abuan, a vehicle passenger, without reasonable, articulable, and individualized suspicion that he was armed and dangerous or independently connected to illegal activity, and the search of the car violated article I, section 7 of the Washington constitution. We also hold that the evidence was insufficient to support Abuan's conviction on count VI, the second degree assault conviction involving Fomai Leoso. We remand to the trial court to vacate the convictions and to dismiss the second degree assault conviction on count VI with prejudice.
I concur: ARMSTRONG, J.
HUNT, J. (dissenting).
¶54 I dissent from the majority's reversal of Abuan's convictions for the reasons articulated in State v. Millan, 151 Wash.App. 492, 499-500, 212 P.3d 603 (2009), review granted, 168 Wash.2d 1005, 226 P.3d 781 (2010) (argued Oct. 25, 2010). In a split decision, we previously held that a defendant who fails to move to suppress evidence seized from a vehicle search incident to arrest fails to preserve this issue for appellate review. Millan, 151 Wash.App. at 499-500, 212 P.3d 603;[13]accord State v. Nyegaard, 154 Wash. *14 App. 641, 226 P.3d 783 (2010).[14] I also dissent from the majority's holding that the evidence was insufficient to support the jury's conviction of Abuan on Count VI, second degree assault, and its dismissal of that count with prejudice.

I. Failure To Preserve Evidentiary Challenge
¶55 Here, as in Millan, Abuan failed to challenge the vehicle search below on any grounds and, therefore, cannot seek suppression for the first time on appeal.[15]See Millan, 151 Wash.App. at 496-500, 212 P.3d 603. Similarly, he failed to challenge below the non-custodial pat down of his person for weapons. Therefore, he has failed to preserve these issues for review. State v. Donohoe, 39 Wash.App. 778, 782 n. 5, 695 P.2d 150 (1985) ("Because a defendant can receive complete constitutional protection against the use of illegally obtained evidence through superior court suppression hearing procedures, and because the rights afforded by these constitutional provisions are not `trial rights' or part of the `truth-finding function,' they can be waived.") (citing State v. Valladares, 99 Wash.2d 663, 671-72, 664 P.2d 508 (1983)), review denied, 103 Wash.2d 1032 (1985).

II. Alleged Constitutional Error Not "Manifest"
¶56 Alternatively, I would adopt Division One's recent approach to a vehicle inventory search incident to arrest and impoundment of a vehicle in State v. Roberts, 158 Wash. App. 174, 240 P.3d 1198 (2010), petition for review filed, No. 85565-0 (Wash. Jan. 25, 2011). Although Roberts did not address Millan's "waiver/failure to preserve" rationale, it did rule, presumably as a result of Roberts' failure to move to suppress below, that the record was insufficiently developed to show that the alleged constitutional error was "manifest": According to Division One, Roberts could not and did not show that the trial court would have granted a motion to suppress evidence lawfully seized during an inventory search before impounding his car.[16] In short, Roberts did not carry his burden to prove that the alleged error was "manifest"; therefore, he could not challenge the legality *15 of the seized evidence for the first time on appeal.
¶57 Similarly, here, in failing to move below to suppress the seizure of evidence of the crime for which he was arrested, Abuan failed to create a record to carry his burden of proof of a manifest constitutional error that he can raise for the first time on appeal: Abuan, like Roberts, cannot show on the record before us the likelihood that the trial court would have granted a motion to suppress had he brought one. Roberts, 158 Wash.App. at 182, 240 P.3d 1198. Thus, I would follow Roberts and Millan, hold that Abuan failed to preserve his evidentiary challenges and suppression issues for appeal, and affirm.

III. Sufficiency of Evidence, Count VI
¶58 The majority holds that the evidence was insufficient to support the jury's finding Abuan guilty of second degree assault. Again, I respectfully disagree. I would hold that under the doctrine of transferred intent,[17] there was sufficient evidence for the jury to find that Abuan intended to cause bodily harm to unseen occupants in the home when he or his accomplice fired several rounds of ammunition into the open attached garage in which people were playing video games. In the alternative, I would hold that there was sufficient evidence to find (1) that Abuan intended his actions to create an apprehension and fear of bodily harm; and (2) that at least one victim inside the home, Fomai Leoso,[18] did, in fact, experience fear and apprehension of bodily harm. I would affirm Count VI.
¶59 The record contains the following evidence that supports the jury's conviction of Abuan on Count VI, second degree assault. On August 15, 2007, Francis Leoso was in his family's garage, playing video games with his younger brother, in the presence of their uncle. Sometime after dark, they heard a car's engine; someone shouted "N-G-C, cuz," 8 Report of Proceedings (RP) at 1016, and suddenly gunfire started hitting the residence. Their older brother, Fomai Leoso, was on the phone inside the house when the shooting began; hearing five or six gunshots, he immediately ran outside. Fomai and Francis then "jumped in[to] a car" to look for the shooters, whom they were unable to find. 10 RP at 1288.

A. Standard of Review
¶60 I agree with the majority's statement of the applicable standard of review. I disagree, however, with the manner in which it has applied this standard to the facts here. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). In considering an allegation of insufficiency, we review the evidence in the light most favorable to the State to determine whether "any rational trier of fact could have found guilt beyond a reasonable doubt." Salinas, 119 Wash.2d at 201, 829 P.2d 1068 (citing State v. Green, 94 Wash.2d 216, 220-22, 616 P.2d 628 (1980)). We must draw "all reasonable inferences from the evidence . . . in favor of the State and interpret [them] most strongly against the defendant." Salinas, 119 Wash.2d at 201, 829 P.2d 1068 (citing State v. Partin, 88 Wash.2d 899, 906-07, 567 P.2d 1136 (1977)). In addition, we afford circumstantial and direct evidence equal weight. See State v. Varga, 151 Wash.2d 179, 201, 86 P.3d 139 (2004).

B. Two Types of Second Degree AssaultElements
¶61 RCW 9A.36.021(1)(c) provides that "[a] person is guilty of assault in the second degree if he or she . . . (c) [a]ssaults another with a deadly weapon." The statute does not *16 define "assault"; thus, the courts must resort to the common law definition. State v. Krup, 36 Wash.App. 454, 457, 676 P.2d 507, review denied, 101 Wash.2d 1008 (1984); RCW 9A.04.060 (common law provisions supplement criminal statutes). The common law defines "assault" and breaks it into two "concepts," or types: one involving an attempt to injure and the other involving putting the victim in fear of injury. See State v. Byrd, 125 Wash.2d 707, 712-13, 887 P.2d 396 (1995).
¶62 Applying these two alternative concepts of assault here, the trial court instructed the jury that it could find Abuan guilty of second degree assault if it found beyond a reasonable doubt that he either (1) performed an act "with intent to inflict bodily injury upon another" or (2) performed an act "with intent to create in another apprehension and fear of bodily injury, and which in fact create[d] in another a reasonable apprehension and imminent fear of bodily injury, "even though the actor did not actually intend to inflict bodily injury."[19] CP at 240 (jury instruction 19). In my view, there is sufficient evidence to support Abuan's second degree assault conviction under both alternatives.

1. Intent to inflict bodily injury
¶63 Our courts have generally defined the first type of "assault" to be "`an attempt, with unlawful force, to inflict bodily injury upon another, accompanied with the apparent present ability to give effect to the attempt if not prevented.'" Krup, 36 Wash. App. at 457, 676 P.2d 507 (quoting State v. Stewart, 73 Wash.2d 701, 703, 440 P.2d 815 (1968)). In State v. Frazier, for example, our Supreme Court explained:
One concept is that an assault is an attempt to commit a battery. There may be an attempt to commit a battery, and hence an assault, under circumstances where the intended victim is unaware of danger. Apprehension on the part of the victim is not an essential element of that type of assault.

81 Wash.2d 628, 631, 503 P.2d 1073 (1972) (emphasis added). See also State v. Eastmond, 129 Wash.2d 497, 500, 919 P.2d 577 (1996)[20] (State must show specific intent to cause bodily injury but need not prove actual fear); State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980) (specific criminal intent may be inferred from conduct where plainly indicated as a matter of logical probability).
¶64 Addressing the first alternativeintent to inflict bodily injurythe trial court's jury instruction defining "assault" correctly focused on whether the evidence proved that Abuan intended to harm "another," not on whether his intent to injure was directed at a specific person.[21] To prove specific intent to cause bodily injury to another, circumstantial and direct evidence have equal weight; thus, the jury was entitled to infer criminal intent from Abuan's conduct. See Varga, 151 Wash.2d at 201, 86 P.3d 139; RCW 9A.08.010(1)(a) ("A person acts with intent. . . when he or she acts with the objective or purpose to accomplish a result which constitutes a crime.").

a. Transferred intent
¶65 It is irrelevant to a "transferred intent" analysis whether Abuan actually saw or knew about his victim's presence in the house. Our Supreme Court has held that first degree assault, RCW 9A.36.011, does not require the defendant's knowledge of the victim's presence:
RCW 9A.36.011 provides that once the mens rea is established, any unintended victim is assaulted if they fall within the terms and conditions of the statute. [State v.] Wilson, 125 Wash.2d [212], at 219, 883 P.2d 320 [(1994)]. This conclusion is supported *17 by the plain language of RCW 9A.36.011(1)(a): "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm: . . . [a]ssaults another with a firearm . . ." (emphasis added). In so reasoning, we hold in accord with Wilson, that once the intent to inflict great bodily harm is established, usually by proving that the defendant intended to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim.

State v. Elmi, 166 Wash.2d 209, 218, 207 P.3d 439 (2009) (emphasis added).
¶66 This Elmi rationale is equally applicable to the first type of second degree assault at issue here. Just as RCW 9A.36.011(1)(a)'s weapon-based first degree assault of "another" with "intent to inflict great bodily harm" can include transfer of the requisite intent from a specific victim to "any unintended victim" in Elmi, so should RCW 9A.36.021(1)(c)'s lesser second degree intent to "assault[] another with a deadly weapon" include transfer of the requisite intent from a specific to an unintended victim.
¶67 For purposes of defining "assault," the difference between first and second degree assault is inconsequential. Here, the instruction defining "assault" provided that a person is guilty of assault if he performs an act "with the intent to inflict bodily injury upon another." CP at 181 (jury instruction 19) (emphasis added). Thus, once established, Abuan's intent to inflict bodily injury on another would transfer to any unseen victims, just as the Supreme Court held in Elmi. 166 Wash.2d at 218, 207 P.3d 439. Under this rationale, when a defendant shoots into "a house, a tavern, or a car, she or he certainly bears the risk of multiple convictions when several victims are present, regardless of whether the defendant knows of their presence." Elmi, 166 Wash.2d at 218, 207 P.3d 439 (emphasis added). And, despite the lack of an instruction on "transferred intent," we may nonetheless affirm on alternate grounds that the record supports. State v. Costich, 152 Wash.2d 463, 477, 98 P.3d 795 (2004) (An appellate court may sustain a trial court on any correct ground).
¶68 Applying Elmi here, there is sufficient evidence, both circumstantial and direct, to support Abuan's second degree assault conviction: When the drive-by shooting began, the three people in the garage saw and heard shouts and gunfire, and they dropped to the floor. Gunshot damage was found on the sides of the garage, in which they had been playing video games. The jury could infer criminal intent from Abuan's conduct in spraying bullets into the open garage in which these three people were visible. See Elmi, 166 Wash.2d at 218-19, 207 P.3d 439; see also Varga, 151 Wash.2d at 201, 86 P.3d 139. These facts support the jury's conclusion that the shooter, Abuan or his accomplice, intended to cause bodily harm to the garage's occupants. Under Elmi, the intent to cause bodily harm could transfer from those in the attached garage to Fomai inside the main part of the house. See Elmi, 166 Wash.2d at 218-19, 207 P.3d 439. This evidence is sufficient to support the jury's conviction of Abuan on Count VI.

b. Extra "requirements"
¶69 The majority, however, appears to read into the applicable assault law additional requirements, both factual and legal, concerning proximity, apprehension, and imminent fear, which neither the statute nor the common law definition of "assault" includes. The majority apparently bases these extraneous requirements on the following three facts, which they find pivotal: (1) that Fomai was inside the house during the shooting and, thus, did not see the bullets being shot from the car as it drove by; (2) that bullet damage was found only on the attached garage, not on the main part of the house; and (3) that the record is devoid of direct testimony from Fomai that he was fearful or apprehensive during the shooting. These facts, however, are not relevant to analyzing whether there is sufficient evidence to support the first type of second degree assault "perform[ed] an act with specific intent to commit bodily injury." Majority at 10.
¶70 The first type of second degree assault requires the State to prove only the defendant's mental state, here, Abuan's "intent to inflict bodily injury on another." CP *18 at 240. Neither the statute nor the common law requires proof of any mental state of the victim; again, as our courts have noted: "Apprehension on the part of the victim is not an essential element of [this first] type of assault." Krup, 36 Wash.App. at 458, 676 P.2d 507 (internal quotation omitted). Thus, the absence of testimony about Fomai's mental state is irrelevant.[22] Nor, contrary to the majority's implication, does the law does require that the assault victim be within a certain proximity to the potential harm.[23] Similarly, the majority's asserted lack of damage to the house is also irrelevant to a sufficiency of the evidence analysis for Count VI.
¶71 But even if this fact were relevant, it does not negate the possibility of inferring Abuan's intent to assault the occupants of the house from the uncontroverted fact of the bullets spraying the occupied garage during his drive-by shooting. Taking the evidence in the light most favorable to the State, as we must,[24] the record shows that the attached garage was an integral part of the house: Photographs clearly showed that the main part of the house was connected to the garage to form one unified structure. See Exs. 21, 23, 31. That Fomai's family members were in the garage playing video games the night of the drive-by shooting also showed that the garage was being used as a living space of the house at the time.
¶72 The majority emphasizes that "[n]o shots hit the house," Majority at 12; but the record shows to the contrary. The garage extended toward the street, likely functioning as a shield for the other portion of the house against the spray of bullets during the drive-by shooting. And it was uncontroverted that Fomai's brother Francis was playing video games with his younger brother in this attached garage portion of the house, which the bullets did hit. These facts support treating this attached garage as part of this house under the circumstances of this case. In my view, these facts require affirmance of the jury's verdict, not a finding of insufficient evidence of second degree assault justifying reversal of Abuan's conviction on Count VI.

2. Intent to cause reasonable apprehension of bodily injury
¶73 The Frazier court also explained the second type of assault, as follows:
The second concept is that an assault is "committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is incapable of inflicting that harm." The concept is thought to have been assimilated into the criminal law from the law of torts. It is usually required that the apprehension of harm be a reasonable one.
81 Wash.2d at 631, 503 P.2d 1073 (quoting United States v. Rizzo, 409 F.2d 400, 403 (7th Cir.1969), cert. denied, 396 U.S. 911, 90 S.Ct. 226, 24 L.Ed.2d 187 (1969)).
¶74 Even assuming, without agreeing, that the evidence supports an inference of Abuan's, or his accomplice's, intent to cause bodily harm to only the garage's occupants and that transferred intent does not apply, there is still sufficient evidence to support Abuan's conviction under the second type of assaultperforming an act with "intent to create in another apprehension and fear of bodily injury," which act in fact "creat[ed] in another a reasonable apprehension and imminent fear of bodily injury." CP at 240 (jury instruction 18). The jury reasonably could infer such intent from the fact that Abuan, or an accomplice, discharged over five rounds of bullets into the garage portion of the house.[25]
*19 ¶75 Focusing on the lack of explicit testimony from Fomai about his fear, the majority finds insufficient evidence to show that he actually experienced apprehension and fear of bodily harm. Majority at 12. I respectfully disagree. Fomai testified that while he was on the telephone inside the house, he heard "seven or six," 10 RP at 1287, gunshots and immediately ran outside. In my view,[26] just as the jury could infer Abuan's intent to cause apprehension and fear from someone outside shooting at the house, the jury could reasonably infer Fomai's apprehension and fear of bodily injury when he heard multiple gunshots and immediately ran outside.
¶76 That Fomai ran out to the street immediately after the shooting does not negate the circumstantial evidence and reasonable inference that he in fact felt apprehension and fear of bodily injury from the shots being fired. In a similar case, our Supreme Court held that an officer's tackling an armed defendant did not negate any inference of his apprehension and fear for purposes of proving this element of second degree assault. State v. Miller, 71 Wash.2d 143, 146, 426 P.2d 986 (1967). That the defendant was pointing a gun at the officer was enough for a reasonable juror to find that the officer experienced fear in fact, regardless of his act of bravery in overcoming the armed defendant. Miller, 71 Wash.2d at 146, 426 P.2d 986 (1967) ("The fact that an officer may have the courage and skill to disarm a person does not mean that he is devoid of apprehension when a gun is pointed at him."). Just as the officer's tackling an armed man in Miller did not negate the officer's reasonable fear and apprehension of bodily harm, here, it was not unreasonable for the jury to infer from Fomai's running outside that the sound of multiple shots striking his house placed him in fear of bodily injury for himself, for his family members in the garage, or both. See Salinas, 119 Wash.2d at 201, 829 P.2d 1068 (the jury is entitled to draw reasonable inferences from evidence taken in light most favorable to State). Thus, Fomai's running outside in response to the sound of bullets spraying the house was sufficient circumstantial evidence of his fear resulting from the drive-by shooting.
¶77 Again, the absence of explicit testimony from Fomai about whether he was fearful when he heard the shots and ran out of the house is not sufficient justification for reversing Abuan's second degree assault conviction in Count VI. Focusing on this fact shifts the focus away from the proper test for reviewing a claim of insufficient evidence, namely that (1) we must take the evidence in the light most favorable to the State, despite such perceived evidentiary deficiencies, and determine whether "any rational trier of fact could have found guilt beyond a reasonable doubt," Salinas, 119 Wash.2d at 201, 829 P.2d 1068; (2) we must draw "all reasonable inferences from the evidence . . . in favor of the State and interpret [them] most strongly against the defendant," Salinas, 119 Wash.2d at 201, 829 P.2d 1068; and (3) circumstantial evidence is reliable as direct evidence. Varga, 151 Wash.2d at 201, 86 P.3d 139. Applying these well-settled principles to the evidence here, I would affirm Count VI.
NOTES
[1] We formerly consolidated this case with that of State v. Bluehorse, 159 Wash.App. 410, 248 P.3d 537 (2011), but we deconsolidated the cases in issuing our opinions.
[2] Abuan also argues that testimony by a State's witness improperly commented on his right to silence and that the trial court erred in imposing an indeterminate sentence. He also raises a number of additional issues in a statement of additional grounds for review. RAP 10.10. We do not reach these additional issues based on our decision reversing his convictions.
[3] At trial, Tacoma Police Detective John Bair testified as a gang expert. According to Bair, many smaller gangs affiliate with either the Bloods or the Crips. Bloods associate with the color red, while Crips associate with the color blue. According to Officer Randall Frisbee, another police officer specifically assigned to gang cases, Crips and Bloods traditionally oppose each other, although this is not always the case. Bair testified that Crips and Bloods sometimes commit major crimes together. He also testified that individuals may commit crimes to obtain gang membership and that gang members must commit crimes, especially against rival gang members, to maintain their status in their own gang.
[4] We refer to Francis Leoso and Fomai Leoso by their first names for clarity.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] A "wannabe" is an individual seeking gang membership by committing crimes. 5 RP at 408.
[7] Abuan's trial took place in June 2008. Valdez was decided on December 24, 2009, 167 Wash.2d at 761, 224 P.3d 751, and Patton was decided on October 22, 2009. 167 Wash.2d at 379, 219 P.3d 651.
[8] The transferred intent instruction given at Elmi's trial stated:

"If a person assaults a particular individual or group of individuals with a firearm with the intent to inflict great bodily harm and by mistake, inadvertence, or indifference, the assault with the firearm took [e]ffect upon an unintended individual or individuals, the law provides that the intent to inflict great bodily harm with a firearm is transferred to the unintended individual or individuals as well."
Elmi, 166 Wash.2d at 213, 207 P.3d 439 (quoting Elmi, Clerk's Papers at 181).
[9] We agree with the Elmi dissent that this result is difficult to reconcile with the common law doctrine of transferred intent and may result in a concept of "statutory" transferred intent severed from and far broader than the limited doctrine of common law transferred intent. Elmi, 166 Wash.2d at 220-21, 228-29, 207 P.3d 439 (Madsen, J., dissenting).
[10] In contrast, in Elmi, sufficient evidence supported that the defendant assaulted the unintended victims by causing fear in fact. 166 Wash.2d at 218-219, 207 P.3d 439.
[11] Indeed, no Washington case extends Miller to situations where a gun is not directly pointed at the victim.
[12] At most, we can infer from the State's evidence that, as a matter of logical probability, the shooter intended to injure the garage's occupants because shots only hit the garage.
[13] We in Division Two of the Court of Appeals have an internal split of authority on the need to preserve a challenge to a vehicle search incident to arrest in light of Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009). In Millan, Judges Quinn-Brintnall, Bridgewater, and I held that a defendant cannot challenge on appeal the admissibility of evidence seized from a vehicle during a search incident to arrest without having first raised this challenge in the trial court. Millan, 151 Wash.App. at 500, 212 P.3d 603. In contrast, in State v. McCormick, Judges Houghton (retired), Armstrong, and Penoyar held that a defendant may challenge the admissibility of evidence on appeal without having done so in the trial court, calling Millan into question. State v. McCormick, 152 Wash.App. 536, 540, 216 P.3d 475 (2009), petition for review filed, No. 83796-1 (Wash. Oct. 27, 2009). Following McCormick, in State v. Harris, still another panel, itself split (Judges Armstrong (writing), Penoyar (concurring), and Quinn-Brintnall (dissenting)), declined to hold that a defendant waived his right to challenge a vehicle search when he failed to bring a then meritless motion to suppress, before the United States Supreme Court issued Gant. State v. Harris, 154 Wash.App. 87, 99, 224 P.3d 830 (2010). Judges Quinn-Brintnall, Bridgewater (retired), and Hunt have followed the Millan analysis. Judges Houghton (retired), Armstrong, and Penoyar have followed the McCormick and Harris analyses.

I acknowledge that my colleagues in the majority here in Abuan agree with McCormick. I regret that Division Two's opinions on the issue of waiver in post-Gant evidence challenges lack uniformity and, thus, do not provide guidance to counsel and to the superior courts. In my view, the outcomes of similar cases involving the same issue should not depend on the composition of randomly selected three-judge panels of our court. Under RCW 2.06.040, however, the Court of Appeals considers cases in three-judge panels only; there is no provision for sitting en banc to resolve internal splits. Our system leaves resolution of such internal splits to our Supreme Court, which recently heard argument in Millan and stayed a petition for review of McCormick pending its decision in Millan.
[14] See also ER 103(a)(1) (error may not be predicated on a ruling admitting evidence absent a timely motion stating the specific ground for the objection); State v. Mierz, 127 Wash.2d 460, 468, 901 P.2d 286 (1995) (in failing to move to suppress at trial, defendant waives right to challenge evidence gained in illegal search or seizure).
[15] I respectfully disagree with the majority's holding that Abuan has demonstrated actual prejudice and, thus, manifest error, which he can raise for the first time on appeal.
[16] The Roberts court held:

[I]f the record is insufficient to determine the merits of the constitutional claim of error and the facts necessary to adjudicate the claimed error are not in the record, "no actual prejudice is shown and the error is not manifest" under RAP 2.5(a)(3). McFarland, 127 Wash.2d at 333, 899 P.2d 1251. Where the error is based on trial counsel's failure to move to suppress, the defendant must also show that the trial court would have likely granted the motion. McFarland, 127 Wash.2d at 333-34, 899 P.2d 1251.
Roberts, 158 Wash.App. at 182, 240 P.3d 1198. The court concluded by noting:
Because the defense did not file a CrR 3.6 motion to suppress the cocaine seized from the car, the record is not sufficient to determine the merits of Roberts' claim that the primary purpose of the search was to find contraband, not to conduct an inventory search. The record is also not adequate to determine whether the inventory search was reasonable or there were reasonable alternatives to impoundment. Accordingly, we conclude the record is insufficient to address the merits of whether the inventory search was a valid basis for the search. McFarland, 127 Wash.2d at 338, 899 P.2d 1251.
Roberts, 158 Wash.App. at 184, 240 P.3d 1198 (emphasis added).
[17] "The doctrine of transferred intent was developed at common law in order to provide a mechanism to find a defendant who shoots at B but misses and hits C instead `just as guilty as if his aim had been accurate.'" State v. Elmi, 166 Wash.2d 209, 220, 207 P.3d 439 (2009) (Madsen, C.J., dissenting) (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(d) at 437 (2003)). "Indeed, the very reason for the doctrine is to relieve the prosecution of proving the defendant intended to injure an unintended victim." Elmi, 166 Wash.2d at 220-21, 207 P.3d 439 (Madsen, C.J., dissenting).
[18] Hereafter, I use this victim's first name for clarity; in so doing, I intend no disrespect.
[19] See also CP at 246 (jury instruction 24).
[20] Overruled on other grounds, State v. Easterlin, 159 Wash.2d 203, 149 P.3d 366 (2006).
[21] The majority states that the jury instructions identified Fomai as the victim and, therefore, there is "no room for a transferred intent analysis." Majority at 11. But the record shows that Fomai was identified only in the "to convict" instruction. CP at 246, 239. In contrast, the instruction defining "assault" did not identify Fomai as the victim; the instruction simply used the statutory term "another." CP at 246, 239; majority at 11.
[22] Nevertheless, as I explain later in this dissent, the record does contain circumstantial evidence of the fear of bodily harm and apprehension by all four victims, Fomai and the three people in the garage.
[23] Appropriately, the jury instructions did not include this "extra requirement."
[24] Salinas, 119 Wash.2d at 201, 829 P.2d 1068.
[25] See Eastmond, 129 Wash.2d at 500, 919 P.2d 577 ("A jury may infer specific intent to create fear from the defendant's pointing a gun at the victim, unless the victim knew the weapon was unloaded.") (citing State v. Miller, 71 Wash.2d 143, 146, 426 P.2d 986 (1967); State v. Karp, 69 Wash.App. 369, 374-75, 848 P.2d 1304, review denied, 122 Wash.2d 1005, 859 P.2d 602 (1993); State v. Murphy, 7 Wash.App. 505, 511, 500 P.2d 1276, review denied, 81 Wash.2d 1008, 1972 WL 39953 (1972)).
[26] I respectfully disagree with the Majority's assertion that my Elmi analysis arguably could transform into a victim "anyone" in the neighborhood who heard the shots. See Majority at 11-12. Fomai is not just "anyone"; he was "involved with" a gang that had "problems" with another gang involving "shoot[ings]." 10 RP at 1257-59. Thus, I would hold that it would have been reasonable for the jury to infer that when Fomai heard the shots, he ran outside under the belief that he was the target and that the bullets were being shot at his housenot being sprayed indiscriminately in the neighborhood.