# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Appellant,<br><br>   v.<br><br>TREYVONE JAHEIM ISHAQ,<br><br>               Respondent. | No.  59578-8-II<br><br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — Late in the night on December 13, 2021, Treyvone Ishaq pulled up to his ex-girlfriend's home and discharged a shotgun six times. Ishaq now challenges his conviction for three counts of assault in the first degree, one count of drive-by shooting, and one count of unlawful possession of a firearm. Ishaq raises several issues on appeal, all of which he maintains require reversal or dismissal. First, Ishaq argues that the court erroneously admitted evidence that he had previously carried a pistol in his waistband prior to the shooting, allowing the jury to rely on impermissible character evidence. Second, Ishaq argues that there was insufficient evidence supporting his conviction for the three counts of assault in the first degree. Third, he argues the court erred in failing to provide an unanimity instruction[1] regarding the assault charges, violating

---

[1] An unanimity instruction is also referred to as a *Petrich* instruction. *E.g.*, *State v. Petrich*, 101 Wn.2d 566, 569-70, 683 P.2d 173 (1984) (holding that a jury must unanimously agree "that the criminal act charged in the information has been committed"), *overruled on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014); *State v. Aguilar*, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023).

his right to a unanimous jury verdict. And fourth, he maintains that his conviction for unlawful possession of a firearm in the second degree violates the Second Amendment to the United States Constitution.

We conclude that: (1) the court did not erroneously admit evidence that Ishaq carried a pistol in his waistband prior to the shooting; (2) sufficient evidence supports Ishaq's convictions for assault in the first degree; and (3) the remainder of Ishaq's arguments were not preserved for review. Accordingly, we affirm Ishaq's convictions.

FACTS

I.      BACKGROUND[2]

In 2021, Ishaq and Sandy Doherty were dating. At some point that year, Ishaq and Sandy broke up, and Sandy moved in with her mother, Yun Doherty. Yun lived in Lakewood. Sandy's sister, Mary Hamilton, also lived at the residence along with her husband, Christopher Hamilton, their four-year-old son, and six-month-old twins. Sandy moved into Yun's home following her break up with Ishaq. Sandy would "come and go" and stay with friends periodically. 3 Rep. of Proc. (RP) at 278. Christopher, Mary, and Yun had all encountered Ishaq at least once throughout the course of his relationship with Sandy and were all familiar with what Ishaq looked like.

II.     THE THANKSGIVING ENCOUNTER

Mary, Chris, and their three children were in the living room of Yun's home on Thanksgiving, November 25. At some point that evening, someone rang the doorbell and "bang[ed] on the [front] door." 3 RP at 199. The door's ring camera revealed that it was Ishaq. Mary did not feel safe opening the door, so Christopher answered. Immediately, Christopher

---

[2] Because several of the people involved in the incident share the same last name, we refer to them by their first names. No disrespect is intended.

noticed that Ishaq had a pistol in his waistband, causing Christopher concern. Ishaq asked where Sandy was. Christopher explained that he did not know where Sandy was but said that she was not home. Ishaq replied, "I know she's in there." 3 RP at 181. Christopher again stated that Sandy was not home and encouraged Ishaq to check Sandy's friend's house. Ishaq said that he had already checked Sandy's friend's house, and he left. The encounter lasted only a couple of minutes. At no point did Ishaq make an overt threat toward Christopher.

III.     THE SHOOTING

On the night of Monday, December 13, everyone was present at Yun's home except for Sandy. Three vehicles were parked in the driveway. Christopher and Mary had tucked their children in for the night, and they proceeded to get into their bed. Christopher and Mary were sleeping in their own bedroom and had begun to doze off. Yun had also gone to her room and was lying in bed.

Around 11:00 p.m. to 12:00 a.m., Yun, Christopher, and Mary "heard a really loud bang." 3 RP at 207. Yun immediately got out of bed and looked out her window, which faced the street. There was a person standing in the middle of the road next to a running car.[3] Shortly thereafter, "[a] volley of shots . . . rang out, one after another." 3 RP at 174. Christopher covered Mary in their bed, and Mary "screamed about [their] babies." 3 RP at 174.

After the shooting stopped, Yun ran to the living room to get a better view of the shooter; it was Ishaq. Ishaq was standing behind the car with the door open. Terrified, Yun ran toward Mary and Christopher's room. The car drove off shortly after.

---

[3] The shooting was captured by a security camera installed by Yun's bedroom.

Christopher and Mary ran toward the children's room. The children were unharmed and still asleep. Both Mary and Christopher could hear Yun screaming "Trey[vone] is shooting at us" and "[Treyvone] shot at us; Treyvone shot at us." 3 RP at 174, 209. In the living room, there was broken "glass all over the floor." 3 RP at 210. Mary called 911. Only a couple of minutes had passed since the first shot.

Police arrived at the scene shortly after receiving the 911 call. Officers patrolling in the area heard the gunshots and expected a call to come in. Upon arrival, officers investigated the area. Officers found several shotgun casings and one unfired shotgun slug in the street facing Yun's home. Officer Kasey Bents, observed "that one of the vehicles in the driveway had five holes [in] the side of [it]." 4 RP at 328. Officer Jared Pingul noted that there was a "large hole in the" living room window. 4 RP at 328.

Pingul and Bents did basic interviews with Christopher and Mary and got written statements.[4] Upon further investigation, it was determined that shotgun slugs were used in the shooting.[5, 6] And one of the six discharged slugs penetrated the living room window and the kitchen wall facing the street.[7] The slug was closest to the children's bedroom. Mary later found a fragment of the slug—approximately the size of a quarter—in the children's snack basket.

---

[4] Pingul and Bents did not speak with Yun because there was a language barrier.

[5] A slug is a type of ammunition used for shotguns when shooting at farther ranges. "A slug is a single projectile, heavy, that makes one big hole." 3 RP at 237-38.

[6] Of the six shotgun shells recovered, Detective Darin Sale could not "produce any identifiable ridges or fingerprints," which is common "because the heat" caused by discharging a firearm "usually destroys" any trace of fingerprints. 4 RP at 324.

[7] The Lakewood Police Department did not call Forensic Services to the crime scene to perform a trajectory analysis on any of the discharged slugs because, consistent with department policy, there was no shooting victim.

Officers determined that it was not safe to stay at Yun's house, so Christopher, Mary, their children, and Yun stayed at a hotel. Yun later identified Ishaq in a photo montage in a follow-up interview.

## IV.    ISHAQ'S ARREST

Detective Karen Latimer obtained a search warrant to review cell tower records for a phone number associated with Ishaq. All records were given to Detective Jeff Martin, who then processed the data. Martin's analysis of the records revealed that the phone associated with Ishaq's number was "near the crime scene" at 11:57 p.m., thirteen minutes before the 911 call. 3 RP at 268. Ishaq did not live in the same coverage area as Yun's house.

Ishaq was ultimately arrested and charged with three counts of assault in the first degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the second degree.

## V.    TRIAL

### A.    Reference to Ishaq Possessing Firearms

After voir dire, the court addressed the parties' motions in limine. Defense counsel sought to "exclude reference to [Ishaq] possessing a firearm on any occasion," except for the December 13 shooting. 2 RP at 126. The State wanted to refer to the Thanksgiving encounter, arguing that it was admissible as "res gestae motive." 2 RP at 127. At that time, the State explained that Ishaq had threatened Christopher a few days prior saying, "you need to tell me where Sandy is or you'll be sorry." 2 RP at 128. The court reserved judgment on the motion.

The next day, the court addressed defense counsel's motion regarding Ishaq possessing a pistol on Thanksgiving. Before making its ruling, the State commented, "[Christopher], I just confirmed with him, said that . . . Ishaq came to the door right around Thanksgiving and was clearly

5

armed and he was looking for Sandy. . . . And [Christopher] basically brushed him off. That's the extent of what I want to do on that." 3 RP at 145. Based on the State's offer of proof provided the day prior, the court concluded that the testimony would be admissible under ER 404(b). The court explained that the probative value of the fact that Ishaq possessed a pistol at the Thanksgiving incident outweighed any prejudice because it went to the issues of intent and motive. The court also noted that the evidence was admissible under the theory that it was relevant to the "fear element of the assault, which is one of the ways that assault can be committed." 3 RP at 148.

Later in trial, the court was once again tasked with ruling on the admissibility of the fact that Ishaq was armed with the pistol on Thanksgiving. During Christopher's testimony, he indicated that Ishaq made no threats when he came over to ask for Sandy's whereabouts. Outside the presence of the jury, the State clarified that Ishaq had threatened Christopher sometime in October, "well before" the Thanksgiving encounter. 3 RP at 189. The State further explained that Christopher did "not recall that or [was] afraid that" his prior statement recounting Ishaq's threat, was connected to a prior incident. 3 RP at 189. Based on this, defense counsel questioned the court's previous ruling on its motion in limine. The court explained that its ruling was still in effect based on the alternative theory of admissibility—the fear element of assault.

B.      Ishaq's Stipulation

Outside the presence of the jury, the State, during its case-in-chief, introduced a stipulation prepared by Ishaq regarding his prior felony adjudication. Ishaq agreed that he was "previously convicted of, or adjudicated guilty as a juvenile[,] of a felony offense" for the purposes of the one count of unlawful possession of a firearm in the second degree. Clerk's Papers (CP) at 13.[8] After

---

[8] Ishaq was previously adjudicated guilty of, among other crimes, residential burglary in violation of RCW 9A.52.025.

engaging in a colloquy with Ishaq, the court accepted the stipulation and later read the stipulation into the record. Then, the State rested its case. At no point during trial did defense counsel argue that the unlawful possession of a firearm charge was unconstitutional under the Second Amendment, even though the trial occurred almost a year after the Supreme Court announced its decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).

C. Ishaq's Motion to Dismiss

Following the State resting its case, Ishaq moved to dismiss all three counts for assault in the first degree. Ishaq argued that there was insufficient evidence to prove that he possessed the intent to inflict great bodily harm because "[t]here was no indication that [Ishaq] was shooting at anyone." 4 RP at 348. The State countered by explaining that there was sufficient evidence based on Ishaq's prior encounters with Sandy's family, the fact that four vehicles were parked in the driveway on the evening of the shooting—supporting a reasonable inference that people were home that night, and the fact that Ishaq was using a high-powered weapon. Ultimately, the court denied Ishaq's motion, reasoning that the underlying circumstances supported "an intent to inflict great bodily harm," especially the fact that one of the shots went through a window and into the home. 4 RP at 350.

D. Jury Instructions

During the colloquy regarding jury instructions, the State requested a transferred intent instruction for the three counts of assault in the first degree. Defense counsel objected to the instruction being provided.

The court concluded that a transferred intent instruction was unnecessary. Under *State v. Elmi*, 166 Wn.2d 209, 207 P.3d 439 (2009), the court reasoned that "the intent to impose great bodily harm," as required by RCW 9A.36.011(1)(a), was "not specific to an individual." 4 RP at 360. Even though the State agreed with the court's interpretation of *Elmi*, it nevertheless objected to the court not providing a transferred intent instruction. The State explained that, under the theory of its case, it opted to pursue the attempted battery definition of assault because the children were unaware of the incident, but they were the closest to the slug that entered the house. Because of this, the State requested the instruction to avoid potential confusion between assault in the first and second degree.

Instruction 9 explained that "[a] person commits the crime of assault in the first degree when, with intent to inflict great bodily harm, he or she assaults another with a firearm." CP at 31. And instructions 10, 11, and 12, the to-convict instructions for the assault in the first degree charges, read as follows:

> To convict the defendant of the crime of assault in the first degree as charged in count 1, [9] each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about December 13, 2021, the defendant assaulted [L.H., M.H., and T.H.];
> (2) That the assault was committed with a firearm;
> (3) That the defendant acted with intent to inflict great bodily harm; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

---

[9] To be clear, instructions 10, 11, and 12 required the jury to find that Ishaq assaulted each child *separately*, respective to the count that they were named under. We only list the victims in this manner to illustrate that each child was named, and the to-convict instruction for all three counts were the same except for the named victim.

CP at 32-34.

Instruction 20 defined assault. Instruction 20 explained that,

> An Assault is an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
> Assault is also an act done with the intent to create apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 42. During the colloquy regarding jury instructions, defense counsel never objected to the court not providing an unanimity instruction for the assault charges. And when the court explained that the definitions of assault did not create alternative means for committing the offense, defense counsel said nothing.

E.     Closing Argument

The State began its closing argument by stating, Ishaq "is the guy who comes out to the house with a pistol sticking out of his waistband wanting to know where Sandy is." 4 RP at 382-83. Later, the State commented,

> Well, [Ishaq is] the guy, right, who keeps going [to] various places looking for Sandy. [Ishaq is] the guy who doesn't give up. [Ishaq] shows up at the house two weeks before [the shooting], apparently with a gun. [Ishaq is] not charged in that, by the way, because we don't know. It could be a BB gun. It could be a water gun. It could be anything. I think from his testimony you can tell that Christopher Hamilton didn't think it was a water gun. But this goes to, you know, *what [Ishaq is] trying to accomplish; what does he intend?*

4 RP at 395 (emphasis added).

When discussing the instructions relevant to the assault charges, the State argued Ishaq had "reason to believe that [there were] people in [Yun's] house." 4 RP at 402. The State proceeded to reference the facts that there were four cars parked outside in the driveway, it was 11:30 at night, and Ishaq knew the family. And when addressing the possibility that Ishaq was not aiming at the

9

house, the State said, "the fact that [Ishaq] fires off five other rounds . . . that aren't necessarily directed at the house doesn't change that. Okay. You don't get partial credit for only firing off one round into the house." 4 RP at 403.

During Ishaq's closing argument, he focused on the credibility of witnesses identifying him at the scene and argued that the shooter did not intend to inflict great bodily harm. Specifically, Ishaq alleged that the shooter was aiming at the car, not the house, which was supported by the positioning of the shooter, the car, and the house. As for the bullet that went into the house, Ishaq suggested that it had ricocheted off one of the wheels, and he referenced the fact that the State failed to conduct a trajectory analysis of the bullet. All this evidence, Ishaq claimed, supported, at most, recklessness on the part of the shooter—not an intent to inflict great bodily harm.

F.      Verdict

Ishaq was found guilty of drive-by shooting, unlawful possession of a firearm in the second degree, and three counts of assault in the first degree with firearm enhancements.

Ishaq appeals his convictions for three counts of assault in the first degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the second degree.

ANALYSIS

I.      THE COURT DID NOT ERRONEOUSLY ADMIT EVIDENCE OF ISHAQ POSSESSING A PISTOL ON THANKSGIVING

We review the trial court's decision to admit or exclude evidence of misconduct under ER 404(b) for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A "court abuses its discretion when its decision is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Thurlby*, 184 Wn.2d 618, 624, 359 P.3d 793 (2015) (internal quotation marks omitted) (quoting *State v. Woods*, 143 Wn.2d 561, 579, 23 P.3d 1046 (2001)). A trial court's error in admitting evidence is reviewed under the standard for

10

nonconstitutional error. *State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). A nonconstitutional error is harmless where there is no reasonable probability that the error materially affected the verdict. *Id*.

"All relevant evidence is admissible." ER 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the termination of the action more probable or less probable than it would be without the evidence." ER 401. There are, however, limitations on the admissibility of relevant evidence.

Under ER 404(b), evidence of prior misconduct is categorically barred when it is offered "for the purpose of proving the character of a person in order to show that the person acted in conformity with that character." *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). But the same evidence may be admitted for proper purposes that include, but are not limited to, "'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* (quoting ER 404(b)). "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case;'" rather, ER 404(b) is intended to prevent "the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

Motive is defined as "something, [such as a] willful desire, that leads one to act." BLACK'S LAW DICTIONARY 1217 (12th ed. 2024). In other words, motive is "the reason or explanation for the offense." *Id.* In contrast, intent is defined as "[t]he state of mind accompanying an act." *Id.* at 963. "'[E]vidence of threats by the defendant[] are probative [to] the question of the defendant's intent.'" *State v. Powell*, 126 Wn.2d 244, 261, 893 P.2d 615 (1995) (quoting *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980)). And "'[e]vidence of intent . . . is to be gathered from all of

the circumstances of the case, including . . . the nature of the prior relationship and any previous threats.'" *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994) (internal quotation marks omitted) (quoting *State v. Ferreira*, 69 Wn. App. 465, 468, 850 P.2d 541 (1993)). Threats may be implied from an individual's conduct. *See In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 726, 543 P.3d 821 (2024).

Before admitting evidence of prior misconduct, a trial court must, on the record, "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."' *Gresham*, 173 Wn.2d at 421 (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). Even when a trial court's rationale for admitting evidence under ER 404(b) was erroneous, reversal is not required when one of the court's "cited bases is justified." *Powell*, 126 Wn.2d at 264.

Here, the court did not err in admitting evidence that Ishaq had a pistol in his waistband when he went to Yun's home on Thanksgiving. The court, on the record, engaged in the four-part analysis required under ER 404(b). First, the court established by a preponderance of the evidence that the incident occurred. Second, the court determined that there were two bases for admitting the evidence. The court explained that the evidence could be introduced for the purpose of motive and/or intent, which was relevant to Ishaq's intent underlying the assault charges, as well as "the fear element of the assault, . . . one of the ways that assault can be committed." 3 RP at 148. Third, the court concluded that the evidence was relevant to establish Ishaq assaulted the victims, a

12

necessary element for the offense. RCW 9A.36.011(1)(a).[10] And fourth, the court determined that the probative value of the evidence outweighed the prejudicial effect it had on Ishaq.

The trial court did not abuse its discretion because the fact that Ishaq had a firearm in his waistband on Thanksgiving was admissible under ER 404(b) for the purpose of motive and/or intent.[11] While it is true that Ishaq made no overt threat toward Christopher that evening, it is obvious that Ishaq's actions amounted to an implied threat. *Arnsten*, 2 Wn.3d at 726 (concluding that the defendant intended to cause apprehension of harm even though he did not directly point his gun at the victim). Christopher testified that simply having what appeared to be a firearm visible in Ishaq's waistband made him concerned. Again, Ishaq showed up uninvited at Yun's home Thanksgiving evening demanding Sandy's whereabouts. When considering the context of the situation, it is evident that Ishaq possessing an alleged pistol was relevant to Ishaq's motive and/or intent because it illustrated his escalating behavior and animosity toward Sandy and her family.

Therefore, we conclude that the court did not erroneously admit evidence of Ishaq carrying a pistol in his waistband prior to the shooting.[12]

---

[10] As provided in instruction 20, assault was defined as attempted battery or apprehension of bodily harm. Because of this, fear was relevant to one of the definitions of assault provided by the court.

[11] Because the evidence was admissible for the purpose of Ishaq's motive and/or intent, we do not need to consider the court's alternative theory of admissibility focusing on the fear element of assault. *Powell*, 126 Wn.2d at 264.

[12] Ishaq argues that the State's comments during closing argument encouraged the jury to base its decision on racial biases, which was supported by the fact that the State emphasized Ishaq possessed a pistol prior to the shooting. While this court takes the threat of racial biases impacting a jury's verdict seriously, we disagree with Ishaq's characterization of the State's comments. During closing argument, the State emphasized that Ishaq possessing a pistol on Thanksgiving was relevant to his intent. As previously explained, this was permissible.

II.    SUFFICIENT EVIDENCE SUPPORTS ISHAQ'S CONVICTION FOR THREE COUNTS OF ASSAULT IN THE FIRST DEGREE

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). Our review, however, is "highly deferential to the jury's decision." *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found [the defendant] guilt[y] beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

"A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, the court must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *Arntsen*, 2 Wn.3d at 724. The standard of review for a challenge to the sufficiency of the evidence supporting a criminal conviction is deferential to the factfinder, and "questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient."). "[E]ven if the only evidence of guilt is circumstantial, the jury need only be convinced of guilt beyond a reasonable doubt." *State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986).

14

Under RCW 9A.36.011(1)(a), an individual is "'guilty of assault in the first degree if she or he, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm.'" *Elmi*, 166 Wn.2d at 214. Therefore, a jury must conclude beyond a reasonable doubt that a defendant, "with (1) the intent to inflict great bodily harm, (2) assaulted (3) another (4) with a firearm." *Id.* at 214-15.

There is no statutory definition for "assault," so Washington courts rely on common law to define the term. *Wilson*, 125 Wn.2d at 217. Our state recognizes three definitions: "(1) an unlawful touching (actual battery); (2) at attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." *Elmi*, 166 Wn.2d at 215. These definitions "do not create additional alternative means of committing the crime of assault." *State v. Smith*, 159 Wn.2d 778, 785, 154 P.3d 873 (2007).[13] When a defendant commits an assault in the form of attempted battery, "[a]pprehension on the part of the victim is" unnecessary. *State v. Frazier*, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972).

Assault in the first degree is a specific intent crime. *See* RCW 9A.36.011(1); *Elmi*, 166 Wn.2d at 215. "Specific intent is defined as intent to produce a specific result, as opposed to [the] intent to do the physical act that produces the result." *Elmi*, 166 Wn.2d at 215. Critically, assault in the first degree "does not, under all circumstances, require that the specific intent match a specific victim." *Id.* Therefore, so long as the State establishes that the defendant possessed "the intent to inflict great bodily harm," the mens rea may be transferred to *any unintended victim*.

---

[13] Ishaq appears to argue that because instruction 20 provided two definitions of assault, the State was required to prove both. If that is his argument, it is incorrect. Because these definitions do not create alternative means of committing the offense, they do not create an additional element that the State must prove beyond a reasonable doubt. *See Smith*, 159 Wn.2d at 788-89. At trial, the State acknowledged that the children were asleep, meaning that its theory of the case could not rely on the apprehension of harm definition of assault. To that end, it made clear that it was relying on the attempted battery definition.

RCW 9A.36.011(1); *Elmi*, 166 Wn.2d at 217; *Wilson*, 125 Wn.2d at 218. In other words, "[w]hile the State . . . can present proof of intent to harm a specific person, *doing so is unnecessary*. All [RCW 9A.36.011(1)] requires is proof the defendant intended to inflict great bodily harm on *someone*, even if that someone is unknown." *State v. Mancilla*, 197 Wn. App. 631, 647, 391 P.3d 507 (2017) (second emphasis in the original). And courts may infer specific intent from a defendant's conduct "'where it is plainly indicated as a matter of logical probability.'" *Arnsten*, 2 Wn.3d at 726 (quoting *Delmarter*, 94 Wn.2d at 638).

A.      The State Did Not Need to Prove Ishaq Intended to Assault a Specific Victim[14]

At the outset, Ishaq argues that because the court did not provide a transferred intent instruction, the jury must have found that Ishaq intentionally assaulted a specific person, *i.e.*, L.H., M.H., and T.H. Ishaq relies on *State v. Abuan*, 161 Wn. App. 135, 257 P.3d 1 (2011), for support. In *Abuan*, the defendant was charged with two counts of assault in the *second* degree after he shot at an attached garage while driving by. *Id*. at 141-45. Fomai, one of the named victims, was inside the house when the shooting occurred, "and he was unable to see who was shooting or what was happening in front of the garage." *Id.* at 142. We held that there was insufficient evidence to support Abuan's conviction for assault in the second degree against Fomai because there was "no evidence that Abuan knew Fomai was at the house or that Abuan intended to fire the gun at Fomai," and the trial court did not provide a transferred intent instruction. *Id.* at 159. We reasoned that *Elmi* was not applicable since Abuan was charged with assault in the *second* degree, not assault in the *first* degree, which was the basis for our Supreme Court's holding in *Elmi*. *Id.* at 157-59.

---

[14] Ishaq appears to make a prosecutorial misconduct claim within his unanimity argument in his opening brief. We will not consider argument that is inadequately briefed. RAP 10.3(a)(6).

*Abuan* is inapplicable for several reasons. First, *Abuan*'s analysis was based on the defendant being charged with *second* degree assault. *Id.* at 157-59. Ishaq, in contrast, was charged with three counts of assault in the *first* degree, meaning *Elmi* is controlling. *See id.* at 156. In *Elmi*, the defendant shot into the living room of his estranged wife while her young child and her two young siblings were present. 166 Wn.2d at 212. Elmi was charged with four counts of assault in the first degree, and he challenged his conviction on the grounds that the State failed to present sufficient evidence and the court erred in providing a transferred intent instruction. *Id.* at 212-13. Our Supreme Court affirmed Elmi's convictions, explaining that the court did not err because a transferred intent instruction was unnecessary. *Id.* at 218. The court recognized that "once the intent to inflict great bodily harm is established, *usually* by proving that the defendant intended to inflict great bodily harm on a *specific person*, the mens rea is transferred under RCW 9A.36.011 to *any unintended victim*." *Id.* (emphasis added). The court's holding was based on the fact that the statutory language of "RCW 9A.36.011 encompasses transferred intent," and they *did not* analyze the doctrine of transferred intent. *Id.*

Second, *Mancilla* is on point. There, four defendants were charged with several counts of assault in the first degree for shooting at an occupied single-wide trailer home. 197 Wn. App. at 639, 649. The jury instructions named different victims, but the defendants argued that the State had to prove the defendants intended to assault a specific person. *Id.* at 648. And because there was "no proof . . . presented at trial that the defendants knew who was inside" the house, the defendants argued their convictions must be overturned for insufficient evidence. *Id.* Division III of this court disagreed, explaining that "a defendant's *generalized intent* to harm one or more persons is sufficient to establish the mens rea of" assault in the first degree. *Id.* (emphasis added).

17

The court did note, however, that while "proof as to a specific victim is *not* required, . . . the State must prove the defendants intended harm to an actual person." *Id.* at 649 (emphasis added).

Therefore, in the case before us, the State did not need to prove that Ishaq specifically intended to assault L.H., M.H., and T.H. Rather, the State must have proved that Ishaq possessed the intent to inflict great bodily harm on a person *in general*. *Id.*; RCW 9A.36.011(1)(a). As explained by the court in *Elmi*,

> Where a defendant intends to shoot into and to hit someone occupying a house, a tavern, or a car, she or he certainly bears the risk of multiple convictions when several victims are present, *regardless of whether the defendant knows of their presence*. And, because the intent is the same, criminal culpability should be the same where a number of persons are present but physically unharmed.

166 Wn.2d at 218 (emphasis added). So long as the State established that Ishaq possessed the intent to inflict great bodily harm, then any unintended victim, within reason, could be a basis for assault in the first degree.[15]

B.    Sufficient Evidence Supports Ishaq's Conviction

When viewing the facts in the light most favorable to the State, a jury could have concluded that Ishaq was guilty of assault in the first degree.[16] The evidence supports that Ishaq possessed the intent to inflict great bodily harm on someone. The night of December 13 was not an isolated event—quite the opposite. Ishaq had several encounters with Christopher, Yun, and Mary throughout the course of his relationship with Sandy. After their breakup, Ishaq repeatedly

---

[15] Ishaq also relies on *State v. Frasquillo*, 161 Wn. App. 907, 255 P.3d 813 (2011), for the proposition that "'intent does not transfer to victims who are neither harmed nor put in apprehension of harm.'" Br. of Appellant at 19 (quoting 161 Wn. App. at 916). *Frasquillo* in inapplicable here because it does not address attempted battery, one of the three recognized definitions of assault in Washington. 161 Wn. App. at 916.

[16] The elements focusing on the crime occurring in the state of Washington and that the assault was committed with a firearm are uncontested on appeal.

attempted to locate Sandy, even showing up on Thanksgiving and implicitly threatening harm by displaying what appeared to be a pistol in his waistband. And on the night of the shooting, Ishaq used a high-powered weapon, one that could, and did in fact, penetrate an interior wall of Yun's home.

Ishaq relies on *State v. Ferreira*, 69 Wn. App. 465, 850 P.2d 541 (1993), for factual support, arguing that Ishaq did not know anyone was home. In *Ferreira*, the defendant, along with three other accomplices, drove by the victim's home while firing a gun, ultimately hitting a six-year-old girl. 69 Wn. App. at 467. The court concluded that there was insufficient evidence to sustain Ferreira's conviction because "the [trial] court entered a finding that it was only likely apparent the house was occupied." *Id.* at 469. Additionally, the trial court determined that "the shots were [not] fired at occupied areas of the house," and were "fired at the kitchen and living room, not the empty bedroom." *Id.*

The case before us is dissimilar. Like *Mancilla*, several cars were outside in the driveway when the incident took place, which supported that people were home. *Mancilla*, 197 Wn. App. at 649. While Ishaq may have never met L.H., M.H., and T.H., he knew, at a minimum, that Yun, Christopher, Mary, and Sandy lived at the residence. Additionally, because the incident took place between 11:00 p.m. and 12:00 a.m. on a Monday night there was a high likelihood that Sandy and her family were occupying the house. And the bullet that entered Yun's home penetrated the wall that was closest to the children's bedrooms. All this evidence supports that Ishaq intended to inflict great bodily harm on an occupant of Yun's home. RCW 9A.36.011(1).

Ishaq argues that the record does not support that he was aiming at the house. Ishaq points to the possibility that the bullet ricocheted off the tire of the car and into Yun's home. But the jury heard this evidence at trial and was not persuaded. A sufficiency of the evidence challenge requires us to be deferential to the fact finder. *Martinez*, 171 Wn.2d at 364.

Therefore, we conclude that there was sufficient evidence such that any rational trier of fact could have found Ishaq guilty of assault in the first degree beyond a reasonable doubt.

III.     ISHAQ WAIVED REVIEW FOR THE REMAINDER OF HIS ARGUMENTS

Generally, courts do not consider issues raised for the first time on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a). An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right." RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33. Critically, RAP 2.5(a)(3) "is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'" *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988) (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part by State v. Valladrares* 99 Wn.2d 663, 664 P.2d 508 (1983)). Instead, the exception "encompasses developing case law while ensuring only certain constitutional questions can be raised for the first time on review." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). And even when a defendant satisfies RAP 2.5(a)(3), the error is still subject to review under the constitutional harmless error standard. *Scott*, 110 Wn.2d at 687 (explaining that RAP 2.5(a)(3) "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt").

To satisfy RAP 2.5(a)(3) "and raise an error for the first time on appeal, [a defendant] must" first demonstrate that "the error is truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. Then, a defendant must prove that the error was manifest. *Id.* Stated differently, "[t]he defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). If a party raising an argument for the first time on appeal fails to satisfy the exception articulated in RAP 2.5(a)(3), we may decline to review the issue.

Courts "do not assume the alleged error is of constitutional magnitude;" instead, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *O'Hara*, 167 Wn.2d at 98.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *Kirkman*, 159 Wn.2d at 935. Actual prejudice requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

A.     Unanimity Instruction

Here, Ishaq failed to argue a need for an unanimity instruction at all possible opportunities. Therefore, Ishaq's claim is unpreserved, and we can decline review of this unless this alleged error is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Ishaq's claim does implicate a constitutional right, *see, e.g.*, *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), but he cannot demonstrate that there was a manifest error.

In both Ishaq's and the State's brief, they appear to suggest that this alleged error is *automatically* reviewable because it implicates the constitutional right to unanimity. But an alleged error must do more than implicate a constitutional right to be reviewable for the first time

on appeal; it must also be *manifest*, which means that it must have caused Ishaq actual prejudice. This, in turn, means that the error must have had practical and identifiable consequences at trial. *O'Hara*, 167 Wn.2d at 99. Consequently, this inquiry is *fact-specific* to each case. *Id.* at 99-100.

Ishaq cannot establish that the court failing to provide an unanimity instruction amounted to a manifest error. This is so because the court only instructed the jury on one means of committing assault in the first degree: assault with a firearm under RCW 9A.36.011(1)(a). As a result, the jury could only convict Ishaq on one means of committing assault. As previously discussed, the definitions of assault do not constitute alternative means. *Smith*, 159 Wn.2d at 785. Moreover, under assault in the first degree, the State needs to establish only that Ishaq had the general intent to inflict great bodily harm on *someone*, not a specific victim. *Mancilla*, 197 Wn. App. at 649. The State also named each victim separately in counts 1 through 3, meaning that the jury had to unanimously conclude that Ishaq assaulted each victim.

Therefore, Ishaq cannot establish that the alleged error was manifest, and we decline to review this alleged error for the first time on appeal.

B.      Unlawful Possession of a Firearm

Next, Ishaq argues that his conviction for unlawful possession of a firearm is unconstitutional, as applied to him, under the Second Amendment to the United States Constitution. Ishaq failed to argue that the unlawful possession of a firearm charge was unconstitutional at trial. In fact, he stipulated that his previous felony adjudication satisfied RCW 9.41.040. Therefore, Ishaq's argument is unpreserved. We may review an alleged error that is unpreserved if Ishaq demonstrates that the issue implicates a "manifest error affecting a constitutional right." RAP 2.5(a)(3). He fails to do so.

Ishaq cannot establish that the issue implicates a constitutional right.[17]  Individuals who have been convicted or adjudicated guilty of a felony offense, *both violent and nonviolent*, do not have a right to possess a firearm under the Second Amendment.  *State v. Ross*, 28 Wn. App. 2d 644, 651, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026, 544 P.3d 30 (2024); *State v. Bonaparte*, 32 Wn. App. 2d 266, 279, 554 P.3d 1245 (2024), *review denied*, 4 Wn.3d 1019, 566 P.3d 98 (2025); *State v. Olson*, 33 Wn. App. 2d 667, 683, 565 P.3d 128 (2025).[18, 19]

Therefore, Ishaq cannot establish the asserted error implicates a constitutional right.  There is no manifest error affecting a constitutional right, and we decline to review the issue for the first time on appeal.

---

[17] Our Supreme Court has previously explained that an individual "being charged, convicted, and sentenced pursuant to an unconstitutional charging statute qualifies as a manifest constitutional error affecting a constitutional right."  *State v. Rice*, 174 Wn.2d 884, 893, 279 P.3d 849 (2012).  Because RCW 9.41.040 is constitutional under the Second Amendment, however, Ishaq does not succeed in demonstrating that his claim implicates a constitutional right.

[18] Ishaq cites to several federal circuit decisions to support that individuals previously convicted or adjudicated guilty of a felony offense have a right to possess a firearm under the Second Amendment.  *See* Br. of Appellant at 42-47 (citing *United States v. Range*, 69 F.4th 96 (3rd Cir. 2023), *vacated by Garland v. Range*, ___ U.S. ___, 144 S. Ct. 2706, 219 L. Ed. 2d 1313 (2024); *United States v. Duarte*, 101 F.4th 657, 2024 WL 2068016 (9th Cir. 2024)); Reply Br. at 23-27 (citing *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024)).  Federal circuit precedent is not binding on this court.  *See State v. Pippin*, 200 Wn. App. 826, 835, 403 P.3d 907 (2017) ("[W]e *may* utilize well-reasoned, persuasive authority from federal courts and sister jurisdictions to resolve a question.") (emphasis added).  Because our state authorities are dispositive on the constitutionality of RCW 9.41.040, we will not read the persuasive circuit authority to reject our state authorities on this issue.

[19] To the extent that Ishaq is arguing there is no historical tradition for disarming individuals who have previously been *adjudicated* of a felony, we decline to address this argument for inadequate briefing.  RAP 10.3(a)(6).

CONCLUSION

Accordingly, we affirm Ishaq's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We Concur:

_____
Glasgow, J.

_____
Cruser, C.J.